**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| **MARK STANFORD, BY AND THROUGH ERIK PHILLIPS, AS GUARDIAN AND CONSERVATOR OF THE PERSON OF MARK STANFORD** | **PLAINTIFF** |
| **vs.** | **CIVIL ACTION No.: 3:22-CV-589-HTW-LGI** |
| **BRANDON NURSING AND REHABILITATION CENTER, LLC, AURORA CARES, LLC, and UNIDENTIFIED ENTITIES 1-10, AND JOHN DOES 1-10 (as to the BRANDON NURSING FACILITY).** | **DEFENDANTS** |

## ORDER

BEFORE THIS COURT is [Docket 13], a Motion to Compel Arbitration and to Stay Proceedings by Defendant Brandon Nursing and Rehabilitation Center, LLC ("Brandon"). Having considered the facts, law, and submissions of the parties, this Court finds that Brandon's motion should be denied.

### I.    BACKGROUND

Plaintiff Mark Stanford ("Stanford") resided at Brandon Nursing and Rehabilitation Center, a skilled nursing facility located in Brandon, Mississippi, from about 2017 to 2022.

Upon Stanford's readmission to Brandon's nursing home after a stint in a hospital in June 2017, Brandon required Stanford to sign some paperwork, including a "Resident and Facility Arbitration Agreement" executed in June 2017 ("the Arbitration Agreement"). Because Stanford was a mentally impaired resident, Russell Phillips, Stanford's brother, signed the paperwork, including the Arbitration Agreement, on Stanford's behalf. The Arbitration Agreement includes

a provision mandating that "[a]ny and all disputes between the Resident and the Facility shall be submitted to binding arbitration where the amount in controversy exceeds $25,000," including "any disputes arising out of or in any way relating to … any of the Resident's stays at the Facility… irrespective of the legal theories upon which the claim is asserted."  [Docket 13-1] at 1.

In 2022, Stanford, a smoker, flicked a lighter while in bed, and a conflagration erupted about him, alighting Stanford's bed, linens, and person.   Stanford suffered severe burns. Thereafter, Plaintiff[1] filed a nursing home negligence suit in this Court against Defendants Brandon, Aurora Cares, LLC ("Aurora"), and several others, including Unidentified Entities 1–10 and John Does 1–10.[2]

Rather than answering the complaint, Brandon filed a Motion to Compel Arbitration, asking this Court to enforce the Arbitration Agreement and to dismiss Plaintiff's claims in this action.  Plaintiff opposed, arguing that Russell Phillips did not have legal authority to sign for Stanford, yielding the Arbitration Agreement unenforceable.  In the alternative, Plaintiff argued that Brandon waived its right to seek arbitration by failing to require new arbitration agreements upon Stanford's subsequent readmissions to the nursing home.  This Court received full briefing and evidentiary submissions from Brandon and Plaintiff and heard oral argument on two occasions.   Both Brandon and Plaintiff have confirmed they are satisfied with their present submissions to this Court.

---

[1] In this suit, because Stanford, himself, is impaired, his guardian and counsel act and argue on his behalf; to avoid confusion, this Court, herein, refers to "Plaintiff" as so acting and arguing.

[2] Stanford later stipulated to the voluntary dismissal of each named Defendant except Aurora, and when Stanford filed an Amended Complaint in August 2024, he omitted all named Defendants other than Brandon and Aurora.

## II.    LAW AND DISCUSSION

### A. Subject-Matter Jurisdiction

"[F]ederal courts are courts of limited jurisdiction, having only the authority endowed by the Constitution and that conferred by Congress." *Halmekangas v. State Farm Fire & Cas. Co.*, 603 F.3d 290, 292 (5th Cir. 2010) (quoting *Epps v. Bexar–Medina–Atascosa Counties Water Improvement Dist. No. 1*, 665 F.2d 594, 595 (5th Cir.1982)) (internal quotations omitted); *see also* U.S. CONST. art. 3, § 2.  "Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).[3]  "A federal district court may exercise original jurisdiction over any civil action that either satisfies diversity requirements or that arises under the federal constitution, statutes, or treaties—commonly referred to as 'federal question' jurisdiction." *Energy Mgmt. Servs., LLC v. City of Alexandria*, 739 F.3d 255, 258–59 (5th Cir. 2014) (citing 28 U.S.C. §§ 1331, 1332, 1369).

This Court finds it does not have "federal question jurisdiction."  Because Plaintiff sues based on state common-law causes of action (i.e. "negligence," "medical malpractice," and "malice[] and/or gross negligence"), [Docket 34], this civil action does not "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331.

As to "diversity" jurisdiction, "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different States." 28 U.S.C. § 1332(a).  One out-

---

[3] Courts may also exercise their discretion to drop non-indispensable parties to perfect diversity of citizenship. *Ray v. Bird & Son & Asset Realization Co.*, 519 F.2d 1081, 1082 (5th Cir. 1975).

of-state defendant is not sufficient to confer diversity jurisdiction; rather, the action must have "complete diversity"—that is, "all persons on one side of the controversy [must] be citizens of different states than all persons on the other side." *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008) (quoting *Harrison v. Prather*, 404 F.2d 267, 272 (5th Cir. 1968)).

Initially unsatisfied with Plaintiff's jurisdictional allegations, this Court heard argument from the parties. This Court, still dissatisfied, granted Plaintiff leave to amend his complaint, without any objection from the parties, in part to cure jurisdictional defects.

In his amended complaint, Plaintiff alleges that this Court has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1332, over this action because complete diversity exists. [Docket 34] at ¶ 2.02. Plaintiff alleges that Stanford, the sole plaintiff, "was, at all times material hereto, a resident of Brandon Nursing and Rehabilitation Center … at 355 Crossgates Blvd, Brandon, MS 39042, from on or about May 12, 2017 until January 20, 2022." *Id.* at ¶ 1.02. Brandon is in Rankin County, Mississippi. Plaintiff further alleges that Stanford is a "citizen of the state of Mississippi." *Id.*[4] Plaintiff pleads that Brandon and Aurora, both limited liability companies, are each citizens of the State of New York where all of the limited liability companies' members are citizens of the State of New York. *Id.* at ¶¶ 1.03–1.04.[5] Plaintiff does not plead the citizenship of Defendants

---

[4] Plaintiff also alleges Erik Phillips, who brings suit on Stanford's behalf as his guardian and conservator, is a citizen of Mississippi. *Id.* at ¶ 1.01. This also follows as a matter of law. *See* 28 U.S.C. § 1332(c)(2) ("the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.").

[5] "[T]he citizenship of a [limited liability company] is determined by the citizenship of all of its members." *Harvey*, 542 F.3d at 1080.

Unidentified Entities 1–10 and John Does 1–10, claiming that these are unidentified individuals and entities.[6]

Plaintiff seeks relief including "economic damages in an amount of at least $1,800,891.77 and noneconomic damages in an amount of at least $5,000,000.00," general and special damages, costs, and punitive damages "in an amount of $20,000,000.00."   [Docket 34] at 12–20. Independently, the severe burns of which Plaintiff complains are the type of harm that easily puts the amount in controversy in excess of $75,000, exclusive of interests and costs.

In light of the above facts, this Court is presently satisfied that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different States" under 28 U.S.C. § 1332(a), and, thus, that this Court has subject-matter jurisdiction to rule in this action.  Under diversity, federal courts apply substantive law of the forum state, here Mississippi.  *Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008) (citing *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 426–27 (1996)).

**B.  Motion to Compel Arbitration**

1. <u>The Arbitration Agreement, to be enforceable, must have been signed by parties with capacity.</u>

Mississippi courts apply "the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (FAA)" to "nursing-home admissions agreements that contain an arbitration clause" because such agreements affect interstate commerce.  *Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155, 1158 (Miss. 2010) (*Vicksburg Partners, L.P. v. Stephens*, 911 So.2d 507, 513, 515–16 (Miss. 2005), *overruled*

---

[6] *Id.* at ¶¶ 1.05, 1.06, 2.02; *see also cf.* 28 U.S.C. § 1441(b)(1) ("In determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title, the citizenship of defendants sued under fictitious names shall be disregarded.").

Should it later appear to the Court that those defendants presently sued under fictitious names are citizens of Mississippi, it will *sua sponte*, or upon motion from either party, reevaluate whether it has subject matter jurisdiction.

*on other grounds by Covenant Health & Rehab. of Picayune, L.P. v. Estate of Moulds ex rel.*

*Braddock*, 14 So.3d 695 (Miss. 2009)); U.S. CONST. art. 1, § 8, cl. 3.[7]   Under the FAA framework:

> [C]ourts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement.
>
> …. Under the second prong, … the question is "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims."

*E. Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002) (quoting *Mitsubishi Motors Corp. v.*

*Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

Here, the only question before the court is the validity of the motion to compel arbitration—

and more specifically, whether the parties to the Arbitration Agreement had legal capacity to make

a contract.[8]   Plaintiff does not contend that the dispute in this action is outside the scope of the

arbitration agreement.   *See* [Docket 25] at ¶ 3.01.   Nor does Plaintiff advance a "second

prong"/"legal constraints" theory, such as unconscionability.[9]

### 2.   While Stanford himself lacked the capacity to enter the Arbitration Agreement, a proper surrogate could still bind him.

Stanford himself did not sign the Arbitration Agreement and, indeed, lacked the capacity

to do so.   Stanford was listed as a party to the Arbitration Agreement, but Russell Phillips,

---

[7] While the Mississippi courts have endorsed the province of the FAA for nursing home arbitration agreements, the parties in this case dispute a narrow issue that does not turn on federal substantive law.

[8] "To determine whether there is a valid arbitration agreement, [Mississippi Courts] apply the law of contracts." *Adams Cmty. Care Ctr., LLC*, 37 So. 3d at 1158 (citing *Grenada Living Ctr., LLC v. Coleman*, 961 So.2d 33, 36–37 (Miss.2007)).   One of the elements of a valid contract is an agreement by "parties with legal capacity to make a contract." *Id.*

[9] Mississippi courts generally define "unconscionability" as "an absence of meaningful choice on the part of one of the parties [to a contract], together with contract terms which are unreasonably favorable to the other party." *Trinity Mission of Clinton, LLC v. Barber*, 988 So. 2d 910, 920 (Miss. Ct. App. 2007) (*Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So.2d 1202, 1207(¶ 11) (Miss. 1998)).

Stanford's brother, signed on his behalf as Stanford's "Family Member or other Representative." [Docket 13-1] at 3.

Brandon only advances one legal theory to argue Russell Phillips had capacity to sign the Arbitration Agreement on Stanford's behalf: that Russell Phillips properly acted as Stanford's healthcare surrogate under the Uniform Health-Care Decisions Act ("the Act") of the Mississippi Code. The Act permits "[a] surrogate" to "make a health-care decision for a patient who is an adult … if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available." Miss. Code Ann. § 41-41-211(1). In an addendum to the admission documents including the Arbitration Agreement, entitled "Appointment of Surrogate," a "Dr. Albert," Stanford's "primary physician," found Stanford "lack[ed] capacity … (1) to understand the significant benefits, risks, and alternatives to proposed health care and (2) … to make and communicate health care decisions" and agreed that a surrogate should be appointed. [Docket 13-2] at 2. Brandon "designate[d] Russell Phillips as surrogate for" Stanford. *Id.* at 1. Russell Phillips accepted and signed. *Id.* While *Erik* Phillips now brings suit as Stanford's guardian and conservator, neither party has argued that Stanford had an appointed guardian or agent at the time of the Arbitration Agreement— and the evidence indicates the opposite. *See generally* [Docket 14, 25, 28]; *see also* [Docket 28-5] at 4 ("Guardianship/Conservatorship/Trust" marked "N" in June 2017). Therefore, this Court next determines whether a surrogate could have bound Stanford to arbitration.

When Russell Phillips signed the Arbitration Agreement on Stanford's behalf, he made a "health-care decision" as a purported surrogate under the Act. The Act defines a "health care decision" as one "regarding the individual's health care, including … [s]election and discharge of health-care providers and institutions." Miss. Code Ann. § 41-41-203(h). The Mississippi

Supreme Court held that "an arbitration provision in a nursing-home admissions agreement is part of the health-care decision when it is 'an essential part of the consideration for the receipt of 'health-care.'" *Adams Cmty. Care Ctr., LLC v. Reed*, 37 So. 3d 1155, 1159 (Miss. 2010) (quoting *Mississippi Care Center of Greenville, LLC v. Hinyub*, 975 So.2d 211, 218 (Miss.2008)).   The Mississippi Supreme Court looked to whether the arbitration agreement "provided that the responsible party was not required to sign the provision in order for the potential resident to be admitted." *Id.*   Here, the first paragraph of the Arbitration Agreement states, "This agreement must be signed in order for the resident to receive services at the facility." [Docket 13-1] at 1. Indeed, Brandon required that Stanford execute this agreement upon readmission to the nursing home after being discharged for a hospital visit. [Docket 28-5].   Thus, if Russell Phillips was authorized to act as Stanford's surrogate, his execution of the Arbitration Agreement was a "health-care decision" that would bind Stanford to arbitration.   Neither Plaintiff nor Brandon disputes this. *See* [Docket 14] at 4; [Docket 25] at ¶3.13.

3.   <u>Russell Phillips, Stanford's brother, must have possessed authority under § 41-41-211(2) to bind Stanford to the Arbitration Agreement.</u>

The parties dispute whether Russell Phillips had statutory authority under the Act to make health-care decisions as Stanford's surrogate.

Stanford did not designate Russell Phillips as his surrogate.   A patient may "designate any individual to act as surrogate by personally informing the supervising health-care provider." Miss. Code Ann. § 41-41-211(2).   While Section 1 of the "Appointment of Surrogate" states that Stanford designates Russell Phillips, Stanford did not sign:

[Docket 13-2] at 1.  Indeed, Plaintiff implicitly argues, and Brandon acknowledges, that Stanford did not designate a surrogate.  [Docket 25] at 2.07, 3.06–07; [Docket 28] at 2.

Where a patient did not designate a surrogate, or where the designated surrogate is not reasonably available, the Act lists others who can serve in that role:

> (2) … In the absence of a designation, or if the designee is not reasonably available, any member of the following classes of the patient's family who is reasonably available, in descending order of priority, may act as surrogate:
>
>> (a) The spouse, unless legally separated;
>>
>> (b) An adult child;
>>
>> (c) A parent; or
>>
>> (d) An adult brother or sister.
>
> (3)  If none of the individuals eligible to act as surrogate under subsection (2) is reasonably available, an adult who has exhibited special care and concern for the patient, who is familiar with the patient's personal values, and who is reasonably available may act as surrogate.

Miss. Code Ann. § 41-41-211.

Brandon designated Russell Phillips as Stanford's surrogate:

[Docket 13-2] at 1.

The "burden of establishing the existence of an arbitration agreement," relating to capacity to make health care decisions for a patient, "rests on the party seeking to invoke [the arbitration agreement]." *Belhaven Senior Care, LLC v. Smith*, 359 So. 3d 612, 617 (Miss. 2023) (quoting *KPMG, LLP v. Singing River Health Sys.*, 283 So. 3d 662, 674 (Miss. 2018)).  Therefore, Brandon bears the burden of demonstrating that Russell Phillips had statutory authority to act as a surrogate for Stanford.

Brandon's *prima facie* showing that Russell Phillips was a proper surrogate consisted of running through the elements of § 41-41-211: Brandon explained that Russell Phillips was Stanford's brother, that Stanford's treating physician certified that Stanford was unable to make health-care decisions, that the Arbitration Agreement was required for Stanford to receive services

at Brandon's facility, and that Russell Phillips accepted the role of surrogate and acknowledged he had the authority to make health care decisions for Stanford. [Docket 14] at 4–5.

Contrary to the errant check mark in the "Appointment of Surrogate," however, Russell Phillips was Stanford's brother, not Stanford's "adult child." Stanford has (and had, at the time of the Arbitration Agreement) an adult son, Mark Sanderson. Plaintiff argues that Mark Sanderson was reasonably available to act as Stanford's surrogate and, because he is in the "adult child" class, Mark Sanderson would have "priority" over Russell Phillips. Therefore, argues Plaintiff, Russell Phillips did not have statutory authority to act as Stanford's health-care surrogate and bind Stanford to arbitration. Brandon argues, in response, that (1) the statute does not disqualify an adult sibling from serving as a health-care surrogate, even if there exists someone higher on the priority chain who is reasonably available, and (2) Mark Sanderson was not reasonably available to act as surrogate because he "declined" the responsibility.

4. <u>If Mark Sanderson, Stanford's son, was reasonably available, Russell Phillips, Stanford's brother, was not a proper statutory surrogate under § 41-41-211(2).</u>

A key question is: What is the effect of the phrase "any member of the following classes of the patient's family who is reasonably available, in descending order of priority, may act as surrogate" on § 41-41-211(2)? Plaintiff and Brandon assert variant interpretations based upon their "plain reading" of the statute. Plaintiff posits that the phrase "in descending order of priority" means that a reasonably available member of a class with higher priority (i.e. an adult child) vitiates the statutory authority of a member of a class with lower priority (i.e. an adult brother or sister).[10]

---

[10] *See, e.g.*, [Docket 25] at ¶¶ 3.05 ("MISS. CODE ANN. § 41-41-211 bars Defendant's attempt to use Russell Phillips as a health-care surrogate where a brother is not statutorily permitted to sign the arbitration agreement where a family member of higher priority (Mr. Stanford's son) is available." (emphasis removed)), 3.10–13 ("Pursuant to MISS. CODE ANN. § 41-41-211(2), the only way Russell Phillips could have signed the agreement would have been if Mr. Stanford's son, Mark Sanderson, was not reasonably available.").

On the other side, Brandon seizes on the language "any member of the following classes" to mean that any family member listed in § 41-41-211(2)(a)–(d) has statutory authority, and the order of "priority" only matters to the extent that there are multiple proper surrogates who disagree on a health-care decision.[11]

"In Mississippi, '[t]he primary rule of [statutory] construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein.'" *Marlow, L.L.C. v. BellSouth Telecommunications, Inc.*, 686 F.3d 303, 307 (5th Cir. 2012) (quoting *DePriest v. Barber*, 798 So.2d 456, 458 (Miss. 2001)).  "The Mississippi Supreme Court has said it 'resorts to the canons of statutory interpretation only where a statute is ambiguous or silent on a specific issue.'" *Id.* (quoting *Lutz Homes, Inc. v. Weston*, 19 So.3d 60, 62 (Miss. 2009)).

The Mississippi Supreme Court requires "a 'strict interpretation' of the Health-Care Decisions Act." *Belhaven Senior Care, LLC*, 359 So. 3d at 618 (Miss. 2023) (quoting *Tarvin v. CLC of Jackson, LLC*, 193 So. 3d 633, 637 (Miss. 2016)); *Hattiesburg Health & Rehab Ctr., LLC v. Brown*, 176 So. 3d 17, 23 (Miss. 2015).  "[Its] cases make clear that [it] 'must follow the plain and unequivocal language of [the Act.]'" *Belhaven Senior Care, LLC*, 359 So. 3d at 618 (quoting *Tarvin*, 193 So. 3d at 638).

Plaintiff points to several cases applying § 41-41-211, but none is fully dispositive.  In one, the Mississippi Supreme Court indicated (in dicta) that a woman's nephew did not meet the

---

[11] *See, e.g.*, [Docket 28] at 1 ("Plaintiff's argument fails, as Mr. Phillips was eligible to serve as Mr. Stanford's surrogate under Mississippi law and agreed to do so.").  Also, at the hearing on May 23, 2023, Counsel for Brandon argued that the statute's "any member" language permitted Russell Phillips to act as surrogate because § 41-41-211(2)'s list contains "adult brother or sister." Counsel argued that a plain reading of the statute means, if there are two surrogates, such as a spouse and an adult child that disagree on a health-care decision, the spouse has priority; but, argued Counsel, the statute does not require a health care provider to first inquire about a spouse and determine if the spouse is reasonably available.

statutory requirements of a healthcare surrogate—in part because the woman "had a living adult child who, under the statute, would have priority to serve as her surrogate, the record contains no evidence that her adult child was unavailable or unwilling to act as a surrogate." *Compere's Nursing Home, Inc. v. Estate of Farish ex rel. Lewis*, 982 So. 2d 382, 384-85 (Miss. 2008). Thus, *Compere's* dealt with the priority of a § 41-41-211(2) adult child over an individual outside of § 41-41-211 categories.

In another lawsuit, a Court of Appeals panel explained that the decedent's sister did not qualify as a healthcare surrogate where someone else was appointed as an attorney-in-fact and there was no proof that said agent was not reasonably available. *Monticello Cmty. Care Ctr., LLC v. Est. of Martin ex rel. Peyton*, 17 So. 3d 172, 180–81 (Miss. Ct. App. 2009). Thus, *Monticello* dealt with the priority of a § 41-41-211(1) agent over a § 41-41-211(2) adult sibling.

In a non-controlling case dealing with a similar statute and citing *Compere's* and *Monticello*, the Court of Appeals of New Mexico found that a patient's husband could not act as surrogate where there was a power of attorney, reasoning that, "[i]f an individual has been selected and given authority by a principal to make health-care decisions on the principal's behalf, … the selected person [must] be unavailable before another individual will be given the authority[.]" *Corum v. Roswell Senior Living, LLC*, 248 P.3d 329, 334–35 (N.M. Ct. App. 2010). Translated to the Mississippi rule, this would confirm a § 41-41-211(1) agent's priority over a § 41-41-211(2) spouse.

The above cases did not deal with the exact situation at bar, where multiple reasonably available family members fall under different § 41-41-211(2)(a)–(d) classes. The parties were

unable to direct this Court to, nor has this Court found through research, any Mississippi precedent dealing with this situation.[12]  According to Brandon, this matters.  *See* [Docket 28] at 2.

The absence of precedent dealing with the exact issue before this Court, however, does not compel a finding in Brandon's favor.  After all, as the proponent of arbitration, Brandon bears the burden to establish Russell Phillips' capacity.  *See Belhaven Senior Care, LLC*, 359 So. 3d at 617–18.  Further, the above cases at least demonstrate that § 41-41-211 priority contests work as threshold questions of capacity (and do not merely arise as a way to resolve a conflict in decision-making) and that the proponent of arbitration must affirmatively disqualify individuals with higher statutory priority.  The cases indicate that the language "in descending order of priority" is an affirmative element or precondition to the assumption of valid surrogate authority.  Brandon has not presented this Court with a sound reason why priority contests between the § 41-41-211(2)(a)–(d) classes and priority contests between the § 41-41-211(1)–(3) categories should be handled differently—particularly where each section refers to who is "reasonably available."[13]

---

[12] Brandon cited some cases at the August 9, 2024, oral argument, including a Mississippi Supreme Court case where the court found that an adult daughter had surrogacy authority because she "was an appropriate member of the classes from which a surrogate could be drawn."  *Covenant Health Rehab of Picayune, L.P. v. Brown*, 949 So. 2d 732, 737 (Miss. 2007), *overruled on other grounds by Covenant Health & Rehab. of Picayune, LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695 (Miss. 2009).  Brandon argued that this case law supports the proposition that healthcare providers are not required to search for alternate potential surrogates, ostensibly because the court was silent on that matter.  Brandon also cited a similar proposition in *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 599 (5th Cir. 2007).  However, these decisions did not affirmatively state that a higher-priority surrogate would not affect their decisions—rather, the issue of alternate potential surrogates simply seems absent from, or irrelevant to, these cases.

[13] This Court confronts an argument that Brandon has not made: In § 41-41-211(1), the Act specifies that a surrogate may act if an agent or guardian does not exist or "is not reasonably available;" in § 41-41-211(2), the Act specifies that family members may act if a designee does not exist or "is not reasonably available;" and in § 41-41-211(3), the Act specifies other adults may act if "none of" the § 41-41-211(2) individuals are "reasonably available."  The Act does not use this negative availability language between the § 41-41-211(2) family member classes—instead, it merely states that "any member … who *is* reasonably available" may act as a surrogate.  However, this Court does not find that this distinction matters, because the "in descending order

This Court notes that the plain language of § 41-41-211(2) militates in favor of Plaintiff's interpretation. In the phrase, "any member of the following classes of the patient's family who is reasonably available, in descending order of priority, may act as surrogate," the "priority" language succeeds the "any member" phrase, indicating "priority" modifies and clarifies "any member." The language also does not specify anything regarding priority being used to select among or choose between competing decisions. Rather, the phrasing controls who "**may act** as surrogate." Priority, then, is a precondition of the statute's affirmative grant of permission for one to act as a decisionmaker—not a method of determining *post hoc* which decision controls.

Later provisions of the Act also rebut the contention that the "priority" language of § 41-41-211(2) only applies in the event of a disagreement between class members. Subsequent paragraphs compel a surrogate to "communicate his or her assumption of authority as promptly as practicable to the members of the patient's family specified in subsection (2) who can be readily contacted," and specify procedures for the healthcare provider to adjudicate disputes between multiple members of a class assuming authority to act as surrogate, if "the supervising health-care provider is so informed." Miss. Code Ann. § 41-41-211(4) and (5). In contrast, the legislature did not add any such procedure to the "priority" language in § 41-41-211(2).

The primary thrust of Brandon's argument is one of public policy. Brandon argued at the August 9, 2024, hearing that Plaintiff's interpretation of § 41-41-211 creates a burden on healthcare providers to go through the list to determine whether other potential surrogates exist and the order of priority. At the May 23, 2023, hearing, Brandon argued that the intent of § 41-

---

of priority" language necessarily implies the negative limitation. This language merely substitutes for a lengthier statute that had to specify, for each class of family members, a condition that "in the absence of a spouse, or if the spouse is not reasonably available, an adult child may act," and so on.

41-211 is to make health care providers' lives easier by permitting them to rely on appropriate family members to make health-care decisions for patients.

Brandon did not provide any case citations to support this proposition. Indeed, Mississippi courts have interpreted the requirements of the Act as exacting. For example, multiple Mississippi cases have confirmed that arbitration agreements signed by a putative surrogate fail unless the record affirmatively proves that the physician who determined the patient's lack of capacity was indeed the patient's *primary* physician.[14] Even if "making the lives of healthcare providers easier" was one of the goals of the Act, this Court need only reach such tangential policy goals if the plain language of the statute is not clear, which is not the situation here. *See Marlow, L.L.C.*, 686 F.3d at 307.

There are certainly good reasons to require healthcare providers to do some due diligence to ensure they are taking directives from a proper surrogate. Brandon argues that Plaintiff's "interpretation of the surrogate requirements could have disastrous implications in other situations." [Docket 28] at 4. Brandon cites as an example that Russell Phillips changed Stanford's code to "Do Not Resuscitate" years ago. *Id.* "If … [Russell] Phillips did not have authority to do so," proposes Brandon, "such a finding could have had disastrous results if Mr. Stanford coded and no CPR was provided." *Id.* at 5. This Court agrees that such a situation could be disastrous,

---

[14] *See, e.g.*, *Tarvin*, 193 So. 3d at 638 ("The fact that a physician has seen a patient twice in nearly three years is not proof that the physician has 'undertaken primary responsibility' for that patient's health care, especially when family members designated another physician as the 'attending physician' in an Admissions Agreement just three days later."); *Belhaven Senior Care, LLC*, 359 So. 3d at 618 (holding that a nurse practitioner's signature does not count, and a doctor's finding of lack of capacity eleven days after signing does not count because it is not contemporaneous); *Adams Cmty. Care Ctr., LLC*, 37 So. 3d at 1159 (finding no evidence certifying doctor was the primary physician, and waxing, "Our Legislature has very specifically provided the manner in which the presumption that an individual has capacity to make a health-care decision may be rebutted[.]").

but finds that this militates even more strongly in Plaintiff's favor; given the importance of healthcare decisions, providers should ensure they are taking direction only from those with the authority to give it.  Some level of burden is obviously tolerable and necessary under any statute. As Plaintiff aptly notes:

> [T]he requirement of following the statute and obtaining the proper signature from a person with authority does not place an onerous [burden] on nursing homes.  Acceptance of a patient to a nursing home is an attenuated approval process.  One cannot just show up with their suitcase and check into a nursing home like they are a hotel rewards member. … Thus, with the notice that nursing homes have of an incoming admission, it is simple for them to call and get the appropriate person to execute the paperwork.  …

[Docket 25] at ¶ 3.15.  And as a court in the Northern District of Mississippi has noted, "Certainly, there are familial relationships and obligations which transcend purely legal ones, and some judges may be inclined not to look too closely underneath the hood of what goes on within the family," but, "[w]hile this court understands, on a human level, the impulse to regard family members as natural agents of one another, Mississippi law in this context does not appear to support that proposition."  *Est. of Jackson By & Through Merriweather v. GGNSC Batesville, LLC*, No. 315-cv-215-MPM-SAA, 2016 WL 1104492, at *4 (N.D. Miss. Mar. 22, 2016).  The "priority" language in § 41-41-211(2) evidences this.

This Court indeed sees no evidence that the burden here would be onerous, as there is already wiggle-room for healthcare providers incorporated in the Act.  The Act defines "[r]easonably available" to mean "readily able to be contacted without undue effort and willing and able to act in a timely manner considering the urgency of the patient's healthcare needs."  § 41-41-203(p).  This Court need not and does not purport to decide at what point an otherwise appropriate surrogate is *not* reasonably available, and indeed expects that this is a question to be

taken up case-by-case.  But this Court does not perceive the act to require some sort of costly fishing expedition to find long-lost relatives.

That the Act includes the "reasonably available" condition and includes "readily able to be contacted" in the definition implies that healthcare providers *are* expected to perform some level of diligence.  The Act also implicitly acknowledges the healthcare provider's grave responsibility in permitting healthcare decisions by non-patients by building in a provision to insulate healthcare providers: the Act permits them to "require an individual claiming the right to act as surrogate for a patient to provide a written declaration under penalty of perjury stating facts and circumstances reasonably sufficient to establish the claimed authority."  Miss. Code. Ann. § 41-41-211(10).

This Court, having strictly construed the language of the Act, examined available Mississippi law interpreting the Act, and considered and weighed the arguments of the parties, finds as follows: The plain language § 41-41-211(2) dictates that the existence of a reasonably available member of a class with higher priority supersedes the statutory authority of a member of a class with lower priority to act as a patient's surrogate.  Thus, if Mark Sanderson, Stanford's son, was reasonably available at the time of the Arbitration Agreement, Russell Phillips did not have statutory authority to act as Stanford's surrogate.

5. <u>Mark Sanderson, Stanford's son, was reasonably available, so the Arbitration Agreement is not enforceable.</u>

This Court has little difficulty finding that Mark Sanderson was reasonably available to act as a surrogate on these facts.  As this Court previously stated, the Act defines "[r]easonably available" to mean "readily able to be contacted without undue effort and willing and able to act in a timely manner considering the urgency of the patient's healthcare needs."  § 41-41-203(p). Plaintiff's evidence shows that Brandon was made aware upon Stanford's admission—including his readmission at which the Arbitration Agreement was signed—that Stanford had a son and was

given Mark Sanderson's name, address, and phone number.  *See* [Docket 25] at ¶ 3.14.  Mark

Sanderson's name, contact information, and relationship to Stanford was recorded multiple times

in Stanford's patient record.  *Id.*; [Docket 28-5, 28-7].  These documents also show that, despite

the errant check-box on the "Appointment of Surrogate" above, Brandon was aware that Russell

Phillips was Stanford's brother, not his son.  *Id.*  Mark Sanderson visited Brandon's facility, as

evidenced by nursing notes recording Mark Sanderson visiting and spending time with his father.

*See* [Docket 25] at ¶ 2.10 (these visits, however, have limited relevance since they were after the

Arbitration Agreement).  Plaintiff also filed an affidavit by Mark Sanderson in which Sanderson

attests that, "[a]t the time of Mark Stanford's admission to Brandon Nursing and Rehab[ilitation]

Center L.L.C., [Sanderson] was mentally capable, physically able, and reasonably available to sign

documentation necessary for admission" and "was readily able to be contacted without undue

effort and willing and able to act in a timely manner in considering my father's health-care needs."

[Docket 26] at 1.

Brandon argues that Mark Sanderson was not reasonably available, writing, "The record

evidence demonstrates that, even if Mr. Sanderson was available, he declined to serve as his

father's surrogate."  [Docket 28] at 1–2.[15]  Brandon goes so far as to claim that "Russell Phillips

[is] the only member of Mr. Stanford's family who assisted with his health-care decisions."  *Id.* at

1.  These contentions that Mark Sanderson declined to serve as surrogate and was completely

uninvolved in his father's health-care decisions lack record citations and appear to be unsupported

attorney arguments.  This Court is not aware of any evidence that Brandon contacted or notified

Mark Sanderson at any point during the "Appointment of Surrogate" time frame, let alone that

---

[15] *See also id.* at 2 ("Although Mr. Sanderson would have priority under the statute, he declined to
act as his brother's surrogate."); *id.* at 4 ("For unknown reasons, Mr. Sanderson declined to do so
and let his uncle manage his father's health care.").

Sanderson declined the surrogate role.  It appears that Brandon extrapolated these contentions from Mark Sanderson's putative absence when Russell Phillip signed Stanford's documents—and from Mark Sanderson's failure to object to Russell Phillips assuming surrogate authority.  *See id.* at 1, 2, 4.  The definition of "reasonably available" does not include "present at admission."  If this were the case, almost anyone could bring an incapacitated person to a healthcare facility and purport to be the surrogate; anyone who did not attend would be out of luck.  Nor does "reasonably available" require an objection.

Brandon also points to a Hospice Certification listing Russell Phillips as Stanford's "Guardian/Legal Representative," but this document was from 2020.  [Docket 28-2].  Brandon does not contend that Stanford had a guardian or agent at the time of the Arbitration Agreement. Brandon claims that "[e]very one of Mr. Stanford's health care providers understood that [Russell] Phillips made health care decisions for his brother, and Mr. Sanderson's sudden availability four years later should not overcome the years of [his] deferring to Mr. Phillips."  [Docket 28] at 4. Even if this were true, § 41-41-211(2) does not have an exception for the subjective misunderstanding of health care providers.  Brandon argues that "despite Mr. Sanderson's claims to have been available and willing to serve as his father's surrogate, he is still not taking the lead in his father's care: he is not the named Plaintiff in this action and is not his father's Conservator." *Id.* at 4.  The appointment of Erik Phillips as Stanford's conservator is irrelevant, as it occurred over five years after the Arbitration Agreement.  *See* [Docket 28-3].

6.   <u>This Court does not reach whether Brandon waived the Arbitration Agreement.</u>

Having determined that Russell Phillips was not a proper health-care surrogate and could not bind Stanford to the Arbitration Agreement, this Court need not examine Plaintiff's alternative argument that Brandon waived its right to enforce the Arbitration Agreement.  *See* [Docket 25] at ¶¶ 3.18–3.21.  Indeed, this analysis would only fold back into the same capacity issues, as the

parties cite discharge and readmission documents, bed holds requiring signatures, and more. *See* [Docket 28] at 5–7. Therefore, this Court does not reach this argument.

### III.    CONCLUSION

Having determined that Russell Phillips did not have statutory capacity to bind Stanford to the Arbitration Agreement, this Court finds that the Arbitration Agreement is not enforceable in this action.

**IT IS THEREFORE ORDERED** that [Docket 13], Brandon's Motion to Compel Arbitration, is **DENIED**. Brandon's Motion to Stay proceedings (also under [Docket 13]) pending the outcome of this motion is **DENIED AS MOOT**. Magistrate Judge LaKeysha Greer Isaac already entered an order *sua sponte* staying the proceedings in this matter pending the resolution of [Dockets 13, 15] (citing L.U. Civ. R. 16(b)(3)(B) ("Filing a motion to compel arbitration, or a motion asserting an immunity defense or jurisdictional defense stays the attorney conference and disclosure requirements and all discovery, pending the court's ruling on the motion, including any appeal.")).

**IT IS FURTHER ORDERED** that discovery and other proceedings in this case remain stayed until the later of this Court's resolution of [Docket 15], the expiration of time for Brandon to file an interlocutory appeal under 9 U.S.C. § 16(a)(1), or the resolution of any such appeal. L.U. Civ. R. 16(b)(3)(B); *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 744 (2023).

**SO ORDERED this the ___3rd___ day of __September__, 2024.**

**/s/ HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**